**UNITED STATES BANKRUPTCY COURT**          *FOR PUBLICATION*
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LIMITED (IN IQUIDATION), FAIRFIELD SIGMA LIMITED (IN LIQUIDATION), and FAIRFIELD LAMBDA LIMITED (IN LIQUIDATION), acting by and through the Foreign Representatives thereof, and KENNETH KRYS and GREIG MITCHELL, solely in their capacities as Foreign Representatives and Liquidators thereof, | Adv. Pro. No. 19-01122 (JPM) |
| Plaintiffs, | |
| v. | |
| CITCO GLOBAL CUSTODY N.V.; CITCO GLOBAL CUSTODY (NA) N.V.; CITCO BANKING CORPORATION N.V.; CITCO BANK NEDERLAND N.V.; CITCO BANK NEDERLAND N.V. DUBLIN BRANCH, and CITCO GROUP LIMITED, | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING
## DEFENDANTS' MOTION TO DISMISS

*APPEARANCES:*

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
*Attorneys for the Defendants, Citco Global Custody (NA) N.V., Citco Banking Corporation N.V., and The Citco Group Limited.*
1285 Avenue of the Americas
New York, NY 10019
By:     Andrew G. Gordon
        Gregory F. Laufer


**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs, Joint Liquidators*
Seven Times Square
New York, NY 10036
By:     Jeffrey L. Jonas
        David J. Molton
        Marek P. Krzyzowski

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

# I.   INTRODUCTION

Pending before the Court is the motion (the "Motion") of the Defendants, The Citco Group Limited ("Citco Group"), Citco Banking Corporation N.V. ("Citco Bank Curaçao"), and Citco Global Custody (NA) N.V. ("Citco Global Custody (Curaçao)")[1] (Citco Global Custody (Curaçao), together with Citco Bank Curaçao, the "Citco Curaçao Entities") (collectively, the "Defendants"), to dismiss the Second Amended Complaint (the "Amended Complaint") for lack of personal jurisdiction.  *See* Mot. to Dismiss, ECF[2] No. 65.  The Court held a hearing on the Motion to Dismiss on May 3, 2024 (the "Hearing").  For the reasons set forth herein, the Court DENIES the Defendants' Motion to Dismiss.

# II.   JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court previously concluded that it has subject matter jurisdiction over this and related actions.  *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018) ("*Fairfield I*"); see also Stip. Order, ECF No. 577.  Personal jurisdiction is contested by the Defendants and will be discussed below.

---

[1]     Defendants Citco Bank Nederland N.V., Citco Bank Nederland N.V. Dublin Branch, and Citco Global Custody NV (collectively, the "Non-Moving Defendants") did not join this Motion to Dismiss.

[2]     Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 19-01122-jpm unless otherwise noted.

1

### III.    <u>BACKGROUND</u>

This adversary proceeding was filed on April 22, 2019.  *See* Compl. ECF No. 1. Kenneth M. Krys and Greig Mitchell (the "<u>Liquidators</u>"), in their capacities as the duly appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation) ("<u>Sentry</u>"), Fairfield Sigma Limited (In Liquidation) ("<u>Sigma</u>"), and Fairfield Lambda Limited (In Liquidation) ("<u>Lambda</u>" and, together with Sentry and Sigma, the "<u>Fairfield Funds</u>") filed the Amended Complaint on November 1, 2021.  *See* Am. Compl., ECF No. 70.  Via the Amended Complaint, the Liquidators seek multiple types of relief including, *inter alia*, the imposition of a constructive trust and recovery of over $1.76 billion in redemption payments made by Sentry, Sigma, and Lambda to various entities known as the Citco Record Holders.[3]  *Id.* ¶ 9; *id.* Exs. A–C.  Of that amount, Citco Bank Curaçao and Citco Global Custody (Curaçao) allegedly received over $70 million[4] through redemption payments from their investment in Sentry and Sigma. Opposition to Citco Banking Corporation N.V., and Citco Global Custody (N.A.) N.V.'s Motion to Dismiss (the "<u>Curaçao Entites Opp'n</u>") at 1–2, ECF No. 97; *see also* Declaration of David J. Molton in Support of the Liquidators' Opposition to Citco Banking Corporation N.V. and Citco Global Custody (NA) NVs Motion to Dismiss ("<u>Molton Curaçao Opp'n Decl.</u>") Exs. 40–50, ECF No. 98 (Redemption Records).  Additionally, the Liquidators also allege that Citco Group received over $1.75 billion[5] through redemption payments from its investment in Sentry, Sigma, and Lambda.  *See* Opposition to Citco Group Limited's Motion to Dismiss Group Opp'n (the "<u>Group Opp'n</u>") at 3, ECF No. 100.

---

[3]    As defined in the Amended Complaint, "Citco Record Holders" refers to various Citco entities, including defendants Citco Global Custody NV and Citco Global Custody (Curaçao), and non-defendants Citco Fund Services (BVI) and Citco Fund Services (Europe) BVI.  *See* Am. Compl. ¶ 9.

A. **The BLMIS Ponzi Scheme**

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[6] *See* Am. Compl. ¶¶ 2, 3. The Defendants allegedly invested or facilitated investments, either for their own account or for the account of others, into several funds — including Sentry, Sigma, and Lambda — that channeled investments into BLMIS. *Id.* ¶¶ 9, 98.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue. *Id.* ¶¶ 2; 58; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund — what Madoff Securities advertised its funds to be — pools investments from multiple feeder funds and then invests the money."). Fairfield Sigma and Lambda, in contrast, were indirect feeder funds, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currencies. *See* Am. Compl. ¶ 57. BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme. *Id.* ¶¶ 3, 6. Without

---

[4]    Of that total U.S. Dollar amount, the Plaintiffs allege that the Citco Curaçao Entities "received approximately $69,918,914.91 from Sentry and $382,764.37 from Sigma. [T]he Liquidators have applied the exchange rate as of the date of the redemption payment out of Sigma. This number may vary if the Court ultimately determines that a different exchange rate applies." Curaçao Entities Opp'n at 1 n.2, ECF No. 97.

[5]    Of that total U.S. Dollar amount, the Plaintiffs allege that Citco Group, through its subsidiaries, "received approximately $1,633,221,298.91 from Sentry, approximately $129,900,574.27 from Sigma, and approximately $1,864,119.68 from Lambda, through the redemption payments at issue in this case. [T]he Liquidators have applied the exchange rate as of the date of each redemption payment out of Sigma and Lambda. This number may vary if the Court ultimately determines that a different exchange rate applies." Group Opp'n at 3 n.4, ECF No. 100.

[6]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff. Details of that scheme have been recounted by many courts. *See, e.g., In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

3

new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart. *Id.* ¶¶ 3, 58.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV"). *Id.* ¶ 10, 11. The Defendants and the beneficial shareholders were allegedly such investors. *Id.* ¶ 14. To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 60. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 61. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 7. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id*. ¶ 63.

With respect to the Defendants, Citco Group is a "company organized under the laws of the Cayman Islands" with a registered address in Grand Cayman, Cayman Islands, and the Citco Curaçao Entities are companies "organized under the laws of Curaçao" with registered addresses in Willemstad, Curaçao. *Id.* ¶¶ 33, 35, 37. Citco Group is the corporate parent of all Citco entities, including the Citco Curaçao Entities, and it allegedly exerted ultimate control over its subsidiaries. *See* Curaçao Entities Opp'n at 6–7, ECF No. 97; *see also* Group Opp'n at 7–8, ECF No. 100. Further, Citco Global Custody (Curaçao), as the agent of Citco Bank Curaçao, allegedly invested into and redeemed shares of Sentry and Sigma. *See* Curaçao Entities Opp'n at 7.

4

Citco Global Custody (Curaçao), as the purported agent of Citco Bank Curaçao, invested and facilitated investments for numerous beneficial shareholders in Sentry as early as 1999. *Id.* at 7. The Citco Curaçao Entities and the Non-Moving Defendants (together, the "<u>Citco Subsidiaries</u>") entered into Brokerage and Custody Agreements (the "<u>B&C Agreements</u>") with numerous beneficial shareholders to facilitate the shareholders' investment into the Fairfield Funds. *See* Am. Compl. ¶ 39; *see e.g.*, Molton Curaçao Opp'n Decl. Ex. 51 at -310–22, ECF No. 98 (February 2005 Brokerage and Custody Agreement between UBS AG NEW YORK BRANCH, Citco Bank Curaçao, and Citco Global Custody (Curaçao)). Although the various B&C Agreements are not identical, the Liquidators allege that some provisions concerning the Defendants' brokerage services being provided are "substantially the same in all the [B&C Agreements]." Am. Compl. ¶¶ 39, 41. These services included, among others, the "effecting transactions of and/or relating to the purchase and sale of and dealing in Securities in the name of the [beneficial shareholders]," the Defendants, or "any nominee for the account of [the beneficial shareholders]" and "any services ancillary thereto as set out in" the B&C Agreements. Molton Curaçao Opp'n Decl. Ex. 51 at -310, Ex. 52 at -162. The B&C Agreements further empowered and obligated the Citco Subsidiaries, "when instructed to do so by the Customer . . . to make settlement of transactions undertaken by or for the Customer" and to "deliver[] or receiv[e] the Securities or other assets of the Customer and mak[e] or receiv[e] payments for the account of the Customer." *Id.* Ex. 51 at -315, Ex. 52 at -166. The B&C Agreements required the Citco Subsidiaries, after receiving an order from a beneficial shareholder, to issue an order confirmation containing the "[f]ull name of the Fund," "[s]ecurities [i]dentification," "[a]mount/ currency/approx. no. of shares" to be purchased or sold, and the "Bank's reference." *Id.* Ex. 51 at -325–26, Ex. 52 at -176–77. Citing to the subscription records produced by non-party Citco Fund

5

Services, the Plaintiffs allege that the Citco Curaçao Entities began their investment in Sentry in 1999. *See* Curaçao Entities Opp'n at 7.

From March 1999 through September 2008, Citco Global Custody (Curaçao), as the purported agent of Citco Bank Curaçao, allegedly subscribed for a total of 144,984.95 shares of Sentry and Sigma. *Id.* at 7; *see also id.* Exs. 15–17, 18-1, 18-2 (Subscription Records). The Citco Curaçao Entities redeemed a total of $70,301,679.28 through 77 redemptions from Sentry and 1 redemption from Sigma from April 2004 through November 2008. *See* Curaçao Entities Opp'n at 12; *see also* Molton Curaçao Opp'n Decl. Exs. 40–50. (Redemption Records). In addition to these redemption payments, the Citco Curaçao Entities allegedly received fees from the clients on whose behalf they invested. *Id.* at 12–13. At the directions and instructions of the Citco Curaçao Entities, Sentry wired the 77 redemption payments totaling $69,918,914.91 "to Citco Bank [Curaçao]'s U.S. accounts." *Id.* at 12.

Bernard Madoff was arrested for alleged violations of federal securities laws on December 11, 2008. *See* Am. Compl. ¶ 107. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 108. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 109, 110. Madoff was sentenced to 150 years in federal prison.[7] *Id.* ¶ 111.

The Amended Complaint alleges that the Defendants "knew, were willfully blind to, and recklessly disregarded that the Net Asset Value was inflated at the time the redemption payments

---

[7] Madoff died in April 2021. *See In re Fairfield Sentry Limited*, 662 B.R. 873, 881 (Bankr. S.D.N.Y. 2024).

were made." *Id.* ¶ 124.  The Amended Complaint further asserts that, while receiving redemption payments, the Defendants "saw and appreciated … [the risk] that the Funds' assets with BLMIS did not exist[,]" but recklessly disregarded those risks and "accepted dramatically higher fees … in exchange for … their continued silence regarding BLMIS's role as custodian of the Funds' assets." *Id.* ¶¶ 94, 99.  These risks signaling potential fraud at BLMIS included the Defendants' repeated concerns that there was no "independent confirmation of the existence of the Funds' assets [held by BLMIS]," Madoff's failure to segregate duties, and BLMIS's employment of a "two-man audit firm [that] did not 'match up' to the size of the company" rather than a reliable auditor. *Id.* ¶¶ 83–85.  In the face of red flags such as these, the Defendants purportedly "quietly reduce[d] their exposure to the Funds and BLMIS," by "dramatically [increasing their Custodian] fees." *Id.* ¶¶ 103, 106.

B. **The Prior Litigation and Procedural History**

The Fairfield Funds were put into liquidation in the BVI in 2009.  *Id.* ¶¶ 26–28.  The BVI court issued orders appointing the foreign representatives, Kenneth Krys and Greig Mitchell, as liquidators of the Fairfield Funds.  *Id.* ¶ 29.  Pursuant to the appointment order of the BVI court,[8] the "Foreign Representatives are responsible for all aspects of the Funds' business, including protecting, realizing, and distributing assets for the Funds' estates."  *Id.* ¶ 117.  The Liquidators commenced actions in the BVI against a number of investors who had redeemed shares of the Fairfield Funds before the collapse of the scheme.  *See* Mem. L. at 4, ECF No. 827; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475 (S.D.N.Y. 2022); *see also Fairfield*

---

[8]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice."  *See* Am. Compl. at 1.

*Sentry Ltd. v. Theodoor GGC Amsterdam (In re Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("*Fairfield II*").

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings. *See* Am. Compl. ¶ 30, ECF No. 70. This Court granted that recognition on July 22, 2010. *Id.* All cases filed by the Plaintiffs were administratively consolidated before this Court in November 2010. *See* Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25.

In the other related consolidated adversary proceedings, the Liquidators seek to recover redemption payments made to the beneficial shareholders. The Liquidators commenced this adversary action in April 2019 to seek recoveries from the numerous Citco entities that facilitated the subscription and redemption payment transfers between the Fairfield Funds and the beneficial shareholders.

C. **The Pending Motion**

The Amended Complaint seeks various forms of relief under the BVI Insolvency Act and BVI common law, including the imposition of a constructive trust on the redemption payments received from the Fairfield Funds.[9]  Am. Compl. ¶ 126, ECF No. 70. The Amended Complaint alleges that the Defendants had knowledge, but were "willfully blind to, and recklessly

---

[9]      Other causes of action include unfair preferences under BVI's Insolvent Act § 245, undervalue transactions under the Insolvent Act § 246, unjust enrichment, money had and received, breach of contract, and breach of the implied covenant of good faith and fair dealing. *See* Am. Comp. ¶¶ 128–268.

Because the Motion only seeks dismissal for lack of personal jurisdiction, the Court makes no finding here with respect to the merits of the Liquidators' other claims mentioned above. However, the Court notes that it has previously dismissed substantially similar claims in certain related adversary actions, and following such dismissals, only the constructive trust claim remains. *See Fairfield II*, 596 B.R. at 300–302 (dismissing the Liquidators' BVI common law claims other than the constructive trust claim); *see also In re Fairfield Sentry Limited*, 2020 WL 7345988 at *7 (Bankr. S.D.N.Y. Dec. 14, 2020) ("*Fairfield III*") (finding that the Liquidators' BVI Insolvency Act claims are barred by Bankruptcy Code §§ 546(e) & 561(d)).

disregarded" the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶¶ 122, 124. "By reason of their receipt, directly or indirectly, of some or all of the Redemption Payments, the [Defendants] have been unjustly enriched to the detriment of the [Fairfield] Funds and other shareholders and creditors of the Funds." *Id.* ¶ 123.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 206 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that the Defendants purposefully availed themselves of the laws of the United States and the State of New York by "investing money with the Funds, and knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS." Am. Compl. ¶ 19.

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022. *See* Scheduling Order, ECF No. 49; Second Am. Scheduling Order, ECF No. 85. Merits document and expert discovery is ongoing in this case. *See* Tenth Am. Scheduling Order, ECF No. 129; Eleventh Am. Scheduling Order, ECF No. 132.

Defendants have moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over the Citco Curaçao Entities and the Citco

9

Group, and that exercising personal jurisdiction would be unreasonable. *See* Mem. L. at 1–4, 21–22, ECF No. 65.

The Liquidators filed two oppositions to the Motion — one with respect to the Citco Curaçao Entities and another with respect to the Citco Group. *See* Curaçao Entities Opp'n, ECF No. 97; *see also* Group Opp'n, ECF No. 100. The Liquidators also submitted the declarations of David J. Molton and Sara Joyce in support of their oppositions. *See* Molton Curaçao Opp'n Decl., ECF No. 98; Declaration of Sara Joyce ("Joyce Curaçao Opp'n Decl."), ECF No. 99; *see also* Declaration of David J. Molton in Support of Liquidators' Opposition to Citco Group Limited's Motion to Dismiss (the "Molton Group Opp'n Decl."), ECF No. 101; Declaration of Sara Joyce ("Joyce Group Opp'n Decl."), ECF No. 102.[10]

The Liquidators argue in their oppositions that exercising jurisdiction over the Defendants would be reasonable and that Defendants' contacts with the United States, through their own actions and those of their purported agent, in knowingly and intentionally investing in Sentry, using U.S. correspondent accounts to invest in and receive payments from Sentry, and conducting other business activities support personal jurisdiction. *See* Curaçao Entities Opp'n at 1–3; *see also* Group Opp'n at 2. The Defendants filed a reply memorandum on August 27, 2023. *See* Reply, ECF No. 113. Finally, the Liquidators filed a sur-reply memorandum on November 15,2023. *See*

---

[10]    Pursuant to various orders of this Court, portions of certain filings and supporting documents have been filed under seal. At the Hearing on the motion, the Court gave the parties the opportunity to withdraw from the record any previously-sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the opinion. Hr'g Tr. 12:5–17, ECF No. 135. None of the parties in this matter requested information withdrawn. The Court will nevertheless refrain from referring to any bank account numbers or names of individual employees, named only in sealed documents, in full.

Sur-Reply, ECF No. 124. This Court reviewed the above filings and held a hearing on the Motion

on May 3, 2024. *See* Hr'g Tr., ECF No. 135.

## IV.    DISCUSSION

### A.    The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair

play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516

(Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "In

adversary proceedings, courts must determine whether the defendant has minimum contacts with

the United States, rather than with the forum state." *Picard v. Fairfield Greenwich Grp. (In re*

*Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman Bros.*

*Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)). "When jurisdiction is satisfied through

Bankruptcy Rule 7004,[11] a bankruptcy court need not address its state's long-arm statute." *Id.*

n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124 F.3d 619, 630

(4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant himself

creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations omitted).

---

[11]    "The summons and complaint and all other process except a subpoena may be served anywhere in the United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the United States." Fed. R. Bankr. P. 7004(f).

There are three conditions necessary for the Court to exercise specific jurisdiction[12] over the non-

resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of
> conducting activities within the forum State or have purposefully directed its
> conduct into the forum State.  Second, the plaintiff's claim must arise out of or relate
> to the Defendants' forum conduct.  Finally, the exercise of jurisdiction must be
> reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiffs "must make a prima facie showing that jurisdiction

exists."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting *Penguin Grp. (USA)*

*Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)).  A trial court has considerable procedural

leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).  *Dorchester Fin. Sec.,*

*Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies

depending on the procedural posture of the litigation."  *Id.* (quoting *Ball v. Metallurgie Hoboken-*

*Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)).  Following discovery, "the plaintiff's prima facie

showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that,

if credited by the trier, would suffice to establish jurisdiction over the defendant."  *Ball*, 902 F.2d

---

[12]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction.  A state court may exercise general jurisdiction only when a defendant is 'essentially at home' in the State."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 352, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)).  The Plaintiffs do not allege that the Court has general jurisdiction over Defendant.  *See* Reply at 7, ECF No. 113 ("The Liquidators do not and cannot allege that the Court has general jurisdiction over the [Citco] Curaçao Entities . . .."); Curaçao Entities Opp'n at 3 (arguing that the Court's specific jurisdiction is founded on Defendants' contacts with the forum that relate to the claims at issue); *see also* Group Opp'n at 2.

at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL 5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." *Averbach* , 2023 WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that their prima facie showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss after jurisdictional discovery has taken place, "the court must 'construe the pleadings and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

## B. **Analysis of Purposeful Availment**

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170 (2d Cir. 2013) ("*Licci IV*"). For specific personal jurisdiction, "'[c]ourts typically require that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134)

13

(alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

The Defendants assert in the Motion that the Liquidators failed to "plead any jurisdictional allegations" against them because the Citco Curaçao Entities and the Citco Group "are organized and do business overseas[, and they have no] offices, employees, or assets in the United States." Mem. L. at 2–3, ECF No. 65. Indeed, the Defendants further assert that the Liquidators could not have plead such allegations. Specifically, the Defendants argue that the Citco Group "is a holding company that has no business operations and provides no services," and any potential contacts from the Group's subsidiary are "insufficient to support personal jurisdiction." *Id.* at 3. Moreover, the Defendants argue that the Citco Curaçao Entities also lack jurisdictional contacts because they "dealt only with the nonparty administrators for the Funds [] that were themselves based, and conducted business, overseas." *Id.*

In response, the Plaintiffs allege that the Defendants have established sufficient jurisdictional contacts with the United States through certain purported agency relationships. The Plaintiffs first noted that Citco Global Custody (Curaçao) "directly entered into subscription agreements with Sentry and Sigma in its own name … which made Citco Global Custody (Curaçao) a shareholder of the Funds." Curaçao Entities Opp'n at 5, ECF No. 97. Because Citco Global Custody (Curaçao) was purportedly an agent of Citco Bank Curaçao at all times, the Liquidators then argue that Citco Global Custody (Curaçao)'s jurisdictional contacts should be imputed to Citco Bank Curaçao. *See id.* at 14–19. Further, the Plaintiffs argue the alleged contacts of Citco Subsidiaries, including those of the Citco Curaçao Entities, should also be imputed to the Citco Group — the corporate parent of all Citco entities — because the Group exerted ultimate

control over and profited from the Citco Subsidiaries' investment in the Fairfield Funds. *See* Group Opp'n at 24, ECF No. 100. Relatedly, the Plaintiffs also argue that Citco Group was "directly involved in diligence of BLMIS in New York…" *Id.* at 14.

The Defendants do not dispute the purported agency relationship between Citco Global Custody (Curaçao) and Citco Bank Curaçao. However, they deny the allegations that the Citco Group had jurisdictional contacts with the United States, and that the Citco Subsidiaries acted as their agents "in connection with the [Fairfield] Funds." Reply at 16–22, ECF No. 113. They also argue that the Citco Curaçao Entities' actions do not amount to jurisdictional contacts. Specifically, the Defendants argue that while Citco Global Custody (Curaçao) signed several subscription agreements with the Fairfield Funds, Citco Global Custody (Curaçao) "was not the beneficial owner of [the Fairfield] shares … [a]nd it was [the] Beneficial Shareholders who decided to invest in the Funds." Reply at 2, ECF No. 113. Hence, the Defendants argue that the Citco Curaçao Entities "did not 'purposefully avail' themselves … of the privileges of conducting business in the United States." *Id.* at 2. The Liquidators raise two counterarguments. First, the Plaintiffs argue that the Citco Curaçao Entities established sufficient contacts because they "received overpaid returns from a Madoff feeder fund and used U.S. accounts to do so[.]" Sur-Reply at 2, ECF No. 124. Second, the Plaintiffs allege that the Defendants applied the incorrect standards in arguing that the Citco Subsidiaries were not agents of the Citco Group. *Id.* at 3.

Although the Liquidators also allege that Citco Group had "direct U.S. contacts supporting jurisdiction," many of their jurisdictional allegations concerning Citco Group rely on the purported agency relationships between the Group and its subsidiaries. *Id.* Therefore, the Court will first analyze whether the Citco Subsidiaries' actions should be imputed to the Citco Group before examining whether the allegations support jurisdiction.

15

1. **Whether the Citco Subsidiaries Acted as Agents of the Citco Group for Purposes of Personal Jurisdiction**

A defendant "can purposefully avail itself of a forum by directing its agents . . . to take action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014). In the absence of a formal agency relationship, the Court may impute an agent's conduct within or aimed at the forum to the principal based on "the realities of the relationship in question rather than the formalities of agency law." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986). Even a defendant that "indirectly transacts financial instruments in a forum may have purposefully availed itself of the forum if the transactions were effected by the defendant's agent." *In re Eur. Gov't Bonds Antitrust Litig.,* 2020 WL 4273811, at *6 (S.D.N.Y. July 23, 2020).

The Court must determine whether the alleged activities of the Citco Subsidiaries should, for the purposes of establishing specific personal jurisdiction in this Court, be imputed to the Citco Group. The Liquidators assert that the Citco Subsidiaries were "divisions" of Citco Group. *See* Group Opp'n at 8, ECF No. 100. Further, "[a]t all relevant times… each division was ultimately controlled by Citco Group through the Citco Group Executive Committee," and the Group formed management teams "[t]o oversee each of [its] divisions." *Id.* at 8–9. Based on such allegations, the Liquidators argue that "the jurisdictional contacts of Citco Group's agents should be imputed to Group." Sur-Reply at 3. Conversely, the Defendants argue that the Plaintiffs did not provide sufficient evidence to establish the alleged agency relationships, and that none of the Citco Subsidiaries were Citco Group's agents in connection with the Fairfield Funds. *See* Reply at 18–22, ECF No. 113 ("Liquidators allege no facts showing that any Citco subsidiary acted for the benefit of, and with the knowledge and consent of [Citco Group] in connection with redemptions

16

from the [Fairfield] Funds … or that [Citco Group] exercised direct control over any of the subsidiaries' activities in that regard.").

"To establish an agency relationship for jurisdictional purposes, plaintiffs must show that the alleged agent acted in [the forum] for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal." *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (citing *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 2018)). The Plaintiffs argue that the Citco Subsidiaries' conduct satisfies all three prongs of this test, given that (1) the Citco Subsidiaries' conduct in investing in the Funds was taken on behalf and for the benefit of Citco Group; (2) the Citco Subsidiaries acted at the direction and under the control of Citco Group's Executive Committee; and (3) the Citco Subsidiaries acted pursuant to Citco Group's knowledge and consent. *See* Group Opp'n at 30–31, 36. (citing *Licci IV*, 732 F.3d at 171).

The Second Circuit has explained that a principal might not be charged with the acts of an agent when that agent, "though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, [] is acting outside the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (quoting *Munroe v. Harriman*, 85 F.2d 493, 495 (2d Cir. 1936)). This exception is narrow in that the Court may still charge the principal with "the acts and knowledge of an agent as long as the agent in some respect served the principal or, stated differently, unless the agent 'totally abandoned' the principal's interests and 'acted entirely for his own or another's purpose.'" *In re Parmalat Sec. Litig.*, 684 F. Supp. 2d at 472 (finding that although the agent committed fraud "during his term of employment . . . he did it solely to benefit

17

himself" and that the benefit to his employer was "immaterial because [employer] was the victim

of [the agent]'s fraud").

### a. Whether the Citco Subsidiaries' Conduct was Performed on Behalf and for the Benefit of Citco Group

In order to establish an agency relationship for purposes of personal jurisdiction, "the

plaintiff must show that the alleged agent acts 'for[the benefit of' … the non-resident principal …"

*In re Welspun Litig.*, No. 16 CV 6792 (VB), 2019 WL 2174089, at *7 (S.D.N.Y. May 20, 2019)

(quoting *GEM Advisors, Inc. v. Corporacion Sidenor, S.A.*, 667 F. Supp. 2d 308, 318 (S.D.N.Y.

2009)); *see also CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)). The Plaintiffs

argue that the "on behalf/benefit of prong is satisfied when an agent's activities open the principal

to financial gain." Group Opp'n at 26, ECF No. 100 (citing *In re Sumitomo Copper Litig.*, 120 F.

Supp. 2d at 336 (finding defendants benefited from agent's trading activities which could result in

gain if financially successful); *GEM Advisors, Inc.*, 667 F. Supp. 2d at 319 (finding benefit where

defendant "stood to benefit" from the alleged agent's "actions and contracts by receiving some or

all of the sale price")).

The Citco Subsidiaries subscribed for shares in the Fairfield Funds to profit by indirectly

investing in BLMIS.[13]  *See* Group Opp'n at 18; *see also* Curaçao Entities Opp'n at 22.  Citco

Group, through the activities of its purported agent the Citco Subsidiaries, could obtain financial

gains. *See* Group Opp'n at 30.  Further, relying on Citco Group's status as a holding company

---

[13]    Although the Defendants argue that they invested in the Fairfield Funds on behalf of the numerous beneficial shareholders, the B&C Agreements between the Citco Subsidiaries and the beneficial shareholders show that the Citco Subsidiaries derived profits from the investments by "charg[ing] the [beneficial shareholders] fees of all sub-custodians, agents, and third parties … together with all other reasonable costs, expenses and disbursements incurred by the Bank and/or Custodian…" Group Opp'n at 18, ECF No. 100. (citing Molton Group Opp'n Decl. Exs. 67–71 (B&C Agreements)).

managing the Citco Subsidiaries, the Plaintiffs argue that Citco Group "profits through the financial gains of its subsidiaries," and would thus benefit from the Citco Subsidiaries' investments into the Fairfield Funds.  Group Opp'n at 24.  The Defendants deny the Plaintiffs' agency relationship allegations with respect to Citco Group.  They argue that "[the Liquidators]' conclusory … allegation that [Citco Group] obtained pecuniary gains as a holding company, is patently insufficient to establish jurisdiction over [Citco Group]..."  Reply at 15, ECF No. 113. (internal quotation marks omitted).

It is true that the Plaintiffs identified no specific instances where Citco Group derived profits from the Citco Subsidiaries' investment into the Fairfield Funds.  However, allegations of specific instances are not necessary to establish a prima facie claim that an agency relationship exists for purposes of jurisdiction.  Indeed, the District Court addressed this issue in *GEM Advisors, Inc*, 667 F. Supp. 2d 308, where one of the defendants — the corporate parent of the co-defendant — moved to dismiss for lack of personal jurisdiction.  There, as the District Court noted, the plaintiff alleged that the defendant "stood to benefit from [its subsidiary]'s actions and contracts by receiving some or all of the sale price[,]" and "benefitted broadly from the transaction through its relationship with [its subsidiary]."  *Id.* at 319.  Citing to these allegations, the District Court found the plaintiff "adequately alleges facts to establish benefit" for an agency relationship for personal jurisdiction purposes by alleging broadly that the defendant benefited from its subsidiaries' actions.  *See id.*  Here, the Plaintiffs plainly allege that Citco Group derived profits from the Citco Subsidiaries through their relationship, and that the Citco Subsidiaries' activity in relation to investing in the Fairfield Funds generated profits, which plausibly opened Citco Group, as principal, to financial gain.  *See* Am. Compl. ¶ 94 ("Defendants accepted dramatically higher fees … [in] doing business with BLMIS…"); *see also* Group Opp'n at 24 ("As a holding company,

19

Citco Group profits through the financial gains of its subsidiaries…").  Thus, consistent with the District Court's reasoning in *GEM Advisors*, this Court finds that the Plaintiffs' allegations and supporting documents sufficiently demonstrate that the Citco Subsidiaries — in implementing the subscription and redemption decisions — acted on behalf of and for the benefit of Citco Group in the forum.

      **b.**  <u>Whether Citco Group Both Exercised Control Over and Was Aware of and Consented to the Citco Subsidiaries' Activities</u>

To assert an agency relationship, the principal also must have exercised "some control" over the purported agent.  *Scholastic, Inc. v. Stouffer*, 2000 WL 1154252, at *5 (S.D.N.Y. Aug. 14, 2000).  For the purposes of personal jurisdiction analysis, this control prong is satisfied when the principal has "[an] ability . . . to influence [the agent's] acts or decisions by virtue of the parties' respective roles."  *Id.*  (citing *Cutco Indus.  v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).  Control means the "actual exercise of control."  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017).  However, absolute control by the principal is not necessary.  *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp. 2d 424, 442 (S.D.N.Y. 2008).  The knowledge and consent prong is satisfied when the principal is apprised of the agent's activities.  *See Struna v. Leonardi*, 626 F. Supp. 3d 657, 664 (S.D.N.Y. 2022).  Because certain of the same facts in this case bear on "knowledge and consent" and "control," the two questions may be considered simultaneously.  *See Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 326 n.6 (S.D.N.Y. 1998) ("The same considerations which lead this Court to conclude that the plaintiffs have not satisfied the 'control' prong of *Kreutter,* indicate that plaintiffs also have not satisfied the 'knowledge' and 'consent' prongs of the agency test."); *Branham v. ISI Alarms, Inc.,* No. 12-CV-1012 (ARR) (MDG), 2013 WL 4710588, at *7 (E.D.N.Y. Aug. 30, 2013).

Knowledge and consent of the principal have been found where an agent forwarded information to the principal (*Sec. Ins. Co. of Hartford v. ITA Textiles Corp.*, 2000 WL 1576879, at *2–4 (S.D.N.Y. Oct. 23, 2000)), where the complaint asserts that the principal received a policy procured by its agent with a "New York forum selection clause that [the principal] knew or should have known was included" (*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 2021 WL 2000371, at *9 (S.D.N.Y. May 19, 2021)), and where the principal is alleged to have done nothing after having received a cease-and-desist letter aside from forwarding the letter to counsel. *Branham*, 2013 WL 4710588, at *7.

The Liquidators argue that Citco Group exercised significant control over the Citco Subsidiaries' subscription and redemption-related activities and had knowledge of and consented to those activities — rendering Citco Group the principal with respect to those transactions. *See* Group Opp'n at 27–28, ECF No. 100. The Plaintiffs point to the Defendants' corporate structure as an "integrated company with several divisions" to support their allegations, noting that "each division was controlled by Citco Group through the [Citco Group] Executive Committee." *Id.* at 26.[14] According to the Liquidators, Citco Group, through the [Citco Group] Executive Committee, appointed directors "to oversee the daily operations of each of the divisions," and formed a management team that met regularly to "make decisions to be executed by the divisions directors." *Id.* at 26–27; *see also* Molton Group Opp'n Decl. Ex. 17 at -62, ECF No. 101 ("The [Citco Group] Executive Committee is responsible for the daily management of the [Citco Subsidiaries]. The

---

[14]    In their reply, the Defendants argue that the Plaintiffs' characterization of Citco Group and the Citco Subsidiaries' relationship as an "integrated enterprise" has no legal significance with respect to establishing personal jurisdiction. Reply at 15, ECF No. 113. However, the Liquidators later clarified that they do not seek "jurisdiction on the mere basis of a parent-subsidiary relationship." Sur-Reply at 3, ECF No. 124. Instead, their jurisdictional argument relies on the theory of an agency relationship between Citco Group and the Citco Subsidiaries, in addition to Citco Group's alleged direct business contacts with the forum. *See. id.* Accordingly, the Court does not need to address the Defendants' "integrated enterprise" counterargument here.

21

members of the executive committee together with division directors form the management team of the [Citco Subsidiaries].”); Molton Group Opp’n Decl. Ex. 21 at 37:9-39:9 (Deposition transcript of Laurens C. Luckmann confirming that “many of the decisions [Luckmann] implemented as head of [Citco] banking services” were made at the Citco Subsidiaries’ management team meetings).

The Defendants do not dispute the Plaintiffs’ characterization of the Citco Group Executive Committee and the management role it plays, but deny that Citco Group exerted any control over the Citco Subsidiaries with respect to the latter’s investment in the Fairfield Funds. Reply at 18–22, ECF No. 113. They argue the Plaintiffs alleged “only facts consistent with an ordinary parent/subsidiary and holding company/operating company relationship” — insufficient to establish control by Citco Group for jurisdictional purposes. *Id.* at 20. Further, the Defendants note that numerous courts — including a Court in this District — have rejected similar allegations of control in assessing agency relationships for jurisdictional purposes. *See Picard v. The Hebrew Univ. of Jerusalem* (*In re Bernard L. Madoff*), 2023 WL 2667531 (Bankr. S.D.N.Y. Mar. 28, 2023) (finding that a defendant’s alleged imposition of incentive structures that reward a co-defendant for achieving results in a long-standing business relationship was insufficient to constitute a prima facie showing of control for jurisdiction purposes); *see also id.* at 18–22 (citing *Nespresso USA, Inc. v. Ethical Coffee Co. SA*, 263 F. Supp. 3d 498 (D. Del. 2017) (holding that minor overlap in leadership positions between a corporate parent and a subsidiary, the corporate parent’s annual review of a subsidiary’s finances, and setting of corporate policies for a subsidiary were insufficient to establish control under an agency theory for personal jurisdiction)).

The Court disagrees with the Defendants’ arguments. First, the Court finds it significant that the Defendants do not dispute the alleged role played by the Citco Group Executive Committee

in directing and managing the Citco Subsidiaries' day-to-day operations.  Indeed, if such facts

were credited by the Court, there can be little doubt that Citco Group had knowledge of and control

over the Citco Subsidiaries.  Second, the Plaintiffs' factual allegations of Citco Group's control

over the Citco Subsidiaries are distinguishable from those in the two cases cited by the Defendants.

Through the Citco Group Executive Committee, Citco Group allegedly appointed directors to

manage the various Citco Subsidiaries and formed a management team to consider

implementations of certain business decisions by the Subsidiaries' directors.  *See* Group Opp'n at

26–27, ECF No. 100.  Such allegations are more substantial than the ones raised in *Nespresso*

*USA*, where the corporate parent merely had overlapping directors with the subsidiary, reviewed

the subsidiary's finances, and established corporate policies for the subsidiary.  Moreover, the

Court's conclusion in *Hebrew Univ. of Jerusalem* does not help resolve the "control" dispute here

because that case involved the business relationship between two independent entities, not the

relationship between a corporate parent and its subsidiaries.

Based on the foregoing, the Court finds that the Plaintiffs have sufficiently alleged Citco

Group's knowledge and consent, and control over the Citco Subsidiaries' actions, such that the

Subsidiaries' actions may be imputed to Citco Group for the purpose of personal jurisdiction.

Having found that it is appropriate to consider the conduct of the Citco Subsidiaries along with the

allegations of Citco Group's direct actions, the Court will examine the sufficiency of the alleged

contacts.

### 2.  **Defendants' Use of Correspondent Accounts**

The Plaintiffs first point to the Defendants' choice of correspondent accounts, both directly

and indirectly, as sufficient to establish minimum contacts with the United States.  *See* Curaçao

Entities Opp'n at 19, ECF No. 97; see also Group Opp'n at 33–34, ECF No. 100.  "Correspondent

23

accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d 103, 104, 650 N.Y.S.2d 726, 727 (1st Dept 1996)).  Plaintiffs allege that the Defendants, either directly or through their purported agents, deliberately and repeatedly selected and used U.S. correspondent accounts at Citibank, N.A. ("Citibank") and HSBC Bank USA, N.A. ("HBUS") to effectuate the redemption payments that form the harms for which Plaintiffs seek redress.[15]  *See* Curaçao Entities Opp'n at 10–13, 31–34, ECF No. 97; Group Opp'n at 17, 33–35.

Here, the Plaintiffs have shown that the Defendants were able to use either a foreign-based or a U.S.-based correspondent bank account for their redemption requests and they chose the latter. *See* Molton Curaçao Opp'n Decl. Ex. 40, ECF No. 98 (Sentry Confirmation of Order Received to redeem 64.23 shares of Sentry at Citibank in New York); *see also id.* Ex. 41 at -111 (Sentry Confirmations of Order Received to redeem 1,359.05 shares of Sentry at HBUS in New York); Joyce Curaçao Opp'n Decl. at 6–9, ECF No. 99; *id.* at 12 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry

---

[15]    The use of correspondent accounts concerns only the transfers that originated from Sentry. *See* Group Opp'n at 18 n. 21, ECF No. 100 ("Citco Global Custody (Curaçao) and Citco Global Custody (Netherlands) did not designate U.S. correspondent accounts for their redemption of Sigma and Lambda shares. They are nonetheless subject to jurisdiction with respect Sigma and Lambda transactions at issue, [as detailed in arguments concerning the Defendants investment in the Fairfield Funds and other business activity in and directed at the United States]").  The investments in Sigma and Lambda were in Euros and Swiss Francs, respectively, not U.S. dollars, and therefore did not require the use of U.S. correspondent accounts.  *See* Am. Compl. ¶ 2; *see also* Group Opp'n at 3 ("Sentry transferred its proceeds directly to BLMIS in New York, while Sigma and Lambda, established for investments in Euros and Swiss Francs, transferred proceeds to BLMIS via Sentry.").

24

made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* at 13 ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that the Citco Subsidiaries "*frequently used U.S. correspondent accounts in transacting with Sentry.*" Curaçao Entities Opp'n at 31, ECF No. 97 (emphasis in original). The Citco Subsidiaries did so repeatedly, using U.S.-based correspondent accounts at least 2,044 times to make over $2.2 billion of subscription payments.[16] *See* Group Opp'n at 35. Further, the Citco Subsidiaries selected and used their correspondent account at Citibank and HBUS in New York to receive 1,294 redemption payments worth $1.6 billion in total from Sentry.[17] *Id.*; Molton Group Opp'n Decl. Ex. 60–62, 63-1–63-5, 64-1–64-21 at (Sentry Redemption Records). The Defendants actively selected the correspondent account as a means of moving redemption funds through New York. *See* Joyce Group Opp'n Decl. at 8–9, ECF No. 102 (listing multiple "correspondent banks offer[ing] U.S. dollar correspondent accounts located outside of the U.S." during the relevant period). Defendants were free to designate an

---

[16]    Out of these 2,044 Sentry subscription payments that utilized U.S.-based correspondent accounts, the Citco Curaçao Entities allegedly facilitated at least 71 payments totaling $107.43 million. *See* Curaçao Entities Opp'n at 31, ECF No. 97; Molton Curaçao Opp'n Decl. Exs. 15–17, 18-1, 18-2, ECF No. 98 (Sentry Subscription Records).

[17]    Out of these 1,294 Sentry redemption payments that utilized U.S.-based correspondent accounts, the Citco Curaçao Entities allegedly facilitated at least 77 payments totaling $69.91 million. *See* Curaçao Entities Opp'n at 31, ECF No. 97; Molton Curaçao Opp'n Decl. Exs. 45–49, ECF No. 98 (Sentry Redemption Records).

account of its choice, inside the United States or outside, to effectuate transfers and chose one based in the U.S. to receive redemption payments. *See id.* at 10–12 ("Factors Influencing Choice of Correspondent Account").

The Defendants, either directly or through their agents, accomplished the conduct at the heart of the Liquidators' claims regarding payments from Sentry through its use of the U.S.-based correspondent accounts. The Second Circuit has found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged violations supports a finding of sufficient minimum contacts. *Licci IV*, 732 F.3d at 171; *id.* at 168 (quoting *Licci v. Lebanese Canadian Bank*, 20 N.Y.3d 327, 339, 984 N.E.2d 893, 900 (2012)) ("[A] foreign bank's repeated use of a correspondent account in New York on behalf of a client . . . show purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York and the United States."); *see also Spetner*, 70 F.4th at 640 ("[A] defendant foreign bank's 'repeated use of a correspondent account in New York on behalf of a client . . . can constitute transacting business for purposes of § 302(a)(1), even if the defendant has no other contacts with the forum.").[18] A course of dealing can be established through as little as "14 currency exchange transactions between" two foreign entities made through a New York bank. *Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 325 (2016).

The Defendants do not contest their use of U.S.-based correspondent accounts, but instead argue that, *inter alia*, such uses do not establish minimum contacts with the forum for jurisdictional

---

[18]    Section 302(a)(1), New York's long-arm statute, "authorizes personal jurisdiction over a foreign defendant for causes of action that arise out of 'transact[ing] any business within the state,' whether in person or through an agent." *Spetner*, 70 F.4th at 640 (quoting C.P.L.R. § 302(a)(1)).

purposes because the Defendants were not the beneficial shareholders.[19]  Reply at 2, 4–6, ECF No. 113;  According to the Defendants, the Citco Curaçao Entities "were mere conduits for the receipt of the redeemed funds [from Sentry], simply passing them on to the Beneficial Shareholders exclusively at their request without exercising dominion or control over the funds."  *Id.*  Yet, notwithstanding the Defendants' argument, the Court agrees with the Plaintiffs that such technical distinction is immaterial here because "Citco Global Custody (Curaçao) agreed, as a condition of investment, that the [Fairfield] Funds could treat it as absolute owner of the Fund shares."  Sur-Reply at 1, ECF No. 124; *see also* Molton Curaçao Opp'n Decl. Ex. 2 at 7 (Sentry Memorandum of Association) ("[Sentry] shall be entitled to treat the registered holder of any share as the *absolute owner* thereof …") (emphasis added).

The Liquidators have provided support for the allegation that the Defendants, either directly or through their agents, chose to use correspondent accounts in New York to receive payments from Sentry.  *See* Group Opp'n at 17, ECF No. 100.  The redemption forms show that the Defendants selected and used U.S.-based correspondent banks to receive payments from Sentry while foreign options existed.  The Defendants repeated receipt of over a billion dollars of redemption payments for its investments in Sentry through U.S. correspondent accounts demonstrates its purposeful availment of the banking system of New York and the United States.

### 3.  Defendants' Business Contacts with the Forum

The Defendants argue that the "investments in BLMIS in the United States by the [Fairfield] Funds are [] irrelevant because the jurisdictional nexus must arise out of contacts that defendants themselves created with the forum."  Mem. L. at 17, ECF No. 65. (quoting *Walden v.*

---

[19]     The Defendants also argue that their use of U.S.-based correspondent accounts was not sufficiently related to the Liquidators' constructive trust claim.  The Court will address that argument *infra*, Section IV. B. 4.

*Fiore*, 571 U.S. 277, 284 (2014)) (internal quotation marks omitted).  The Plaintiffs respond that the Fairfield Funds' investments in BLMIS are relevant to their claim here.  They argue that the various Citco Subsidiaries — including the Citco Curaçao Entities — invested in the Fairfield Funds "while knowing, intending and contemplating that the substantial majority of funds … would be transferred to BLMIS in New York to be invested in the New York Securities market." Curaçao Entities Opp'n at 23, ECF No. 97. (quoting *Picard v. Bureau of Labor Ins.* (*SIPC v. Bernard L. Madoff Inv. Secs. LLC*), 480 B.R. 501, 517 (Bankr. S.D.N.Y. 2012)) (internal quotation marks omitted).

In *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 418 (1984), the Supreme Court found that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions."  The Supreme Court found that "one trip" to the forum "for the purpose of negotiating the transportation-services contract . . . cannot be described or regarded as a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416.  The Liquidators, however, have described more substantial contacts here.

   a.  **Business Contacts of the Curaçao Entities**

First, the Liquidators point to the documents given to the Defendants — including the Citco Curaçao Entities — by the Fairfield Funds' U.S.-based manager, the Fairfield Greenwich Group ("FGG"), prior to and during the period the Defendants subscribed to Sentry.  *See* Curaçao Entities Opp'n at 7–13, 22–23, ECF No. 97.  ("Citco Global Custody (Curaçao) … received and read a copy of [Sentry's Private Placement Memorandum] and … in subscribing in the [Fairfield] Funds, Citco Global Custody (Curaçao) relied upon the [Private Placement Memorandum].") (quoting Molton Curaçao Opp'n Decl. Ex. 1, ¶¶ 1, 7, ECF No. 98).  Documents that the Defendants received

28

"made clear that the main purpose of the Funds' existence was to funnel money into New York-based BLMIS." *Id.* at 8.

The Plaintiffs point to certain Private Placement Memorandum the Defendants received from Sentry. First, they note that a Private Placement Memorandum from January 1999 (the "January 1999 Memorandum") describes Sentry's dependence upon BLMIS in a subsection under the title of "TRADING RISKS." Molton Curaçao Opp'n Decl. Ex. 19 at -441 ("The services of Messrs. Tucker and Noel and Bernard L. Madoff Investment Securities are essential to the continued operations of the Manager. If any of their services were no longer available, their absence would have an adverse impact upon an investment in the Company. The manager has delegated all investment management duties to Bernard L. Madoff Investment Securities."). The January 1999 Memorandum also describes the business objective of the company as "seek[ing] to achieve capital appreciation of its assets by allocating its assets to an account at Bernard L. Madoff Investment Securities . . . a registered broker-dealer in New York, which employs an options trading strategy described as 'split strike conversion'." *Id.* Ex. 19 at -431. Further, the Plaintiffs allege that another Sentry Private Placement Memorandum from October 2002 (the "October 2002 Memorandum") clarifies that Sentry was contractually required to invest at least 95% of the money it received in BLMIS. *See id.* Ex. 20 at -182. The October 2002 Memorandum also explained that investing in Sentry would require a wire transfer of funds to Sentry's account at HBUS in New York. *Id.* Ex. 20 at -185. These documents show that the Citco Curaçao Entities were aware at the time that their investments in the Fairfield Funds were effectively investments in BLMIS in New York. Citco Bank Curaçao, through its agent, Citco Global Custody (Curaçao), executed subscriptions into Sentry with this knowledge. *See id.* Ex. 1 (2003 Sentry Subscription Agreement); *see also id.* Ex. 25 (July 2004 Sentry Short-Form Subscription Agreement).

29

The Defendants argues that the "subscription agreements [between various Citco entities and the Fairfield Funds] cannot establish personal jurisdiction over the Moving Defendants[]" because they "concern only actions with respect to this Subscription Agreement." Mem. L. at 20–21, ECF No. 65. (internal quotation marks omitted). The Defendants cite the Court's August 2018 *Fairfield I* opinion, which held that the Court lacks personal jurisdiction over certain defendants because the subscription agreements' forum selection clause only provided consent to jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the Fund," and the redemption value dispute did not fall within that category of claims. *Fairfield I*, 2018 WL 3756343, at *11. However, the Liquidators here rely on the subscription agreements and private placement memoranda not to show consent, but to show that when the Defendants invested in Sentry, they did so knowing that they would avail themselves of the benefits and protections of New York. Curaçao Entities Opp'n at 34–35. The Court's holding in *Fairfield I* that the subscription agreement forum selection clause is itself an insufficient basis for exercising personal jurisdiction does not invalidate the import of those clauses for assessing purposeful availment. The subscription agreements signed by the Citco Curaçao Entities support the Plaintiffs' showing of contacts with the forum. [20] *See* Molton Curaçao Opp'n Decl. Exs. 1, 4, 25–26, ECF No. 98.

### b. **Business Contacts of the Citco Group**

As for the Citco Group, the Liquidators assert that the "Citco Group on its own, or through its agents, purposefully availed itself of the United States by engaging in business activity,

---

[20]    The two long form subscription agreements produced by non-party Citco Fund Services and the Defendants in discovery were signed by "Citco Global Custody (NA) N.V.," and the shares were also registered in Citco Global Custody (Curaçao)'s name, with mailing addresses located in Curaçao, Netherlands Antilles. *See* Molton Curaçao Opp'n Decl. Ex. 1 at -084, -086; *id.* Ex. 4 at -113, -115, -121. Two short form subscription agreements from between July 2004 and March 2005 identified Citco Global Custody (Curaçao) as the subscriber and the entity in whose name the shares were to be registered. *See id.* Ex. 25 at -862, Ex. 26 at -690.

including extensive diligence on BLMIS… [and] intentionally investing in BLMIS feeder funds

with the expressed intention of investing in the U.S. financial market through BLMIS." Group

Opp'n at 21, ECF No. 100. Having found for jurisdictional purposes that the Citco Subsidiaries

acted as Citco Group's agents for the Fairfield Funds investments, the Court finds it appropriate

to impute the Subsidiaries' business contacts — including those of the Citco Curaçao Entities

mentioned above — to the Citco Group. In addition, the Liquidators' allegations regarding Citco

Group's business contacts goes beyond that of its purported agents.

The Plaintiffs allege that Citco Group also has sufficient direct contacts with the United

States because it directly engaged in "continuing diligence of the operations of BLMIS in New

York." Group Opp'n at 2. Specifically, the Liquidators allege that "Citco Group repeatedly

attended, or directed its agents to attend, meetings with BLMIS and FGG in New York related to

Citco's investments in and services provided to the Funds[]" in four meetings that took place

between May 2000 to May 2006. *Id.* at 23. At each of these meetings, the alleged representatives

of Citco Group or its agents met with BLMIS and/or FGG personnel to address Citco Group's

concerns regarding the irregularities at BLMIS:

> "In May 2000, in response to concerns … regarding the effect a fraud at BLMIS could have
> on subscriptions in the Funds, [Citco Group's CEO Christopher] Smeets directed Michel
> van Zanten, who was at the time a Vice President of the Citco Fund Services New York
> office, to visit with BLMIS in New York…
>
> On December 17, 2002, Citco Fund Services, as Citco Group's agent[], sent Albert van
> Nijen to New York to meet with BLMIS, Dan Lipton from FGG, and two representatives
> from PwC… Van Nijen stated that the objective of [the meeting was] increasing Citco's
> comfort level with respect to the existence of the assets in relation to our responsibilities
> as Custodian …
>
> In September 2004, [Ermanno] Unternaehrer, a Citco Group director and Executive
> Committee member, attended a meeting in New York with Keunen and Cornelis Boele of
> FGG to discuss changing the custody agreements with the Funds, the Fund PPMs, and the

sub-custody agreement to take away possible liabilities while maintaining Citco Fund Services business …

In May 2006, [William] Keunen, acting on behalf of Citco Group … 'met with Dan Lipton (CFO) and Mark McKeefry (GC) of Fairfield in NY this week to discuss inter alia the custody services provided by Citco Bank for many of the Fairfield funds including Sentry (the Bernie Madoff fund).' Keunen … recommended that Citco Bank step down as Custodian of the Funds and be replaced by Madoff."

*Id.* at 23–24. (internal quotation marks and citations omitted).

In response, the Defendants argue that the alleged Citco Group representatives who attended the meetings were in fact "employees of [the Citco Subsidiaries], not The Citco Group[.]" Reply at 16, ECF No. 113.  Moreover, with respect to Ermanno Unternaehrer ("Mr. Unternaehrer") — a Citco Group director and Executive Committee member — the Defendants argue that he attended the September 2004 meeting "in his capacity as a Citco Financial Services director."  The Defendants thus urge the Court to presume that he was acting for the subsidiary in that meeting. *Id.* at 17. (citing *United States v. Bestfoods*, 524 U.S. 51, 69–70 (1998) ("[C]ourts generally presume that the directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary.")).  The Defendants also argue that the meetings "had nothing to do with redemptions from the Funds or any other matter relating to the Liquidators' BVI constructive trust claim," and instead "involved non-defendant [Citco Subsidiaries] employees involved in their capacity as administrators of the [Fairfield] Funds."  *Id.* at 16–17.

The Plaintiffs counter the Defendants' response in their Sur-Reply, in which they further allege that the Citco Subsidiaries employees who attended these meetings were either directed to do so by Citco Group's CEO, Christopher Smeets ("Mr. Smeets"), or reported their findings to the Citco Group Executive Committee.  *See* Sur-Reply at 4, ECF No. 124.   The Plaintiffs also dispute the Defendants' statement that Mr. Unternaehrer attended the September 2004 meeting on Citco

Financial Services' behalf, on grounds that Citco Financial Services had no involvement in the

hearing. *Id.* at 5. Additionally, the Plaintiffs allege that Mr. Unternaehrer referred to another Citco

entity — Citco Fund Services — in his post-meeting email, and Mr. Unternaehrer "had no

obligations or duties to that entity except in his capacity as a member of the [Citco Group]

Executive Committee." *Id.*; *See also id.* at 5 n. 10. Lastly, the Plaintiffs argue that the meetings

were relevant to their constructive trust claim because they concern "knowledge the NAV was

incorrect, Fund investments and redemption, and … diligence on the [Fairfield] Funds[.]" Sur-

Reply at 5.

While the Court "will not draw 'argumentative inferences' in the plaintiff's favor,"

(*Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994) (quoting *Atlantic Mut.*

*Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992) (citing, in turn, *Norton v.*

*Larney*, 266 U.S. 511, 515, 45 S. Ct. 145, 147, 69 L. Ed. 413 (1925)))), the Court will "construe

jurisdictional allegations liberally and take as true uncontroverted factual allegations." *Robinson*

*v. Overseas Mil. Sales Corp.*, 21 F.3d at 507 (citing *Square D Co. v. Niagara Frontier Tariff*

*Bureau, Inc.*, 476 U.S. 409, 411, 106 S. Ct. 1922, 1923–24, 90 L. Ed. 2d 413 (1986); *Scheuer v.*

*Rhodes*, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); *IUE AFL–CIO Pension*

*Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir. 1993)). Further, where there exist "conflicting

affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie

showing is sufficient notwithstanding the contrary presentation by the moving party." *In re*

*Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (quoting *Seetransport Wiking*

*Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*,

989 F.2d 572, 580 (2d Cir. 1993)) (quotation marks omitted in original). Thus, while the Court

will not infer support for Plaintiffs' arguments notwithstanding contrary allegations or a lack of allegations, it is appropriate to resolve factual disputes in their favor in this context.

Here, the parties present conflicting factual allegations regarding Citco Group's involvements in the due diligence meetings with BLMIS and/or FGG. However, resolving this factual dispute in the Plaintiffs' favor, the Court finds that the Plaintiffs have submitted sufficient evidence that Citco Group had jurisdictional contacts with the United States. Specifically, the Court finds it significant that Mr. Smeets directed Michel van Zanten to attend the May 2000 meeting, and that Mr. Unternaehrer's post-September 2004 meeting email refers to a Citco entity that he was not employed by. *See* Molton Group Opp'n Decl. Ex. 23 at 116:10–23 (Smeets Deposition Transcript stating "I said to Michel van Zanten to pay a visit in New York to Fairfield to raise [concerns regarding BLMIS]."); *see also id.* Ex. 37 at -426 (forwarded email from Mr. Unternaehrer dated September 17, 2004 stating "[t]he main purpose [of the meeting] is to take away possible liabilities while maintaining [Citco Funds Services] business.") Indeed, if such facts were "credited by the ultimate trier of fact, [those facts] would suffice to establish jurisdiction over the defendant." *Terrorist Attacks on September 11, 2001*, 714 F.3d at 673 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir.2010)). Therefore, the Liquidators have sufficiently demonstrated that Citco Group's contacts with the forum warrant the Court's exercising of personal jurisdiction over it.

### 4. Whether the Defendants' Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction

The Court will address the Defendants' remaining arguments that the alleged contacts are not jurisdictionally relevant under Supreme Court precedent. *See* Mem. L. at 16–19, ECF No. 65. Defendants argue that the Plaintiffs have failed to show "[the Defendants'] purposeful availment

34

of the privilege of conducting activities in the forum," as "the foreseeability of forum activity alone is not a sufficient basis for exercising personal jurisdiction over a defendant."  Reply at 5, ECF No. 113.  (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)) (emphasis in original omitted).  In other words, the Defendants argue their knowledge that Sentry would invest money it raised outside of the United States with BLMIS in New York is insufficient to support jurisdiction as a matter of law.  *See id.*

In *Walden v. Fiore*, 571 U.S. 277 (2014), the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as "[p]etitioner never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Id.* at 289.  The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State."  *Id.* at 285.  Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."  *Id.* at 286.

Here, the Plaintiffs' allegations and supporting evidence of intentional investments into BLMIS in New York, selection and use of U.S.-based correspondent accounts, and possible interactions with BLMIS as described above, demonstrate that the Defendants took affirmative actions on its own apart from the conduct of the Plaintiffs.  *See* Curaçao Entities Opp'n at 19–28, ECF No. 97; see also Group Opp'n at 22–25, ECF No. 100.  The Liquidators have shown that the Defendants knew and intended that, by investing in the Funds, their money would enter into U.S.-based BLMIS.  *See* Curaçao Entities Opp'n at 30–31; *see also* Molton Curaçao Opp'n Decl. Ex.

35

19, ECF No. 98 (January 1999 Sentry Private Placement Memorandum). Indeed, this certainty can

be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they

received in U.S.-based BLMIS.  *See* Molton Curaçao Opp'n Decl. Ex. 20 at -182. ("The Manager,

in its sole and exclusive discretion, may allocate a portion of [Sentry]'s assets (never to exceed, in

the aggregate, 5% of [Sentry]'s Net Asset Value at the time of investment) to alternative

investment opportunities other than the account at [BLMIS].").  Moreover, the Plaintiffs have

alleged that the Defendants, either directly or through their agents, conducted due diligence

investigations and benefited from the materials that they received from FGG which confirmed the

investments would be made with BLMIS in New York. Curaçao Entities Opp'n at 8–10; Group

Opp'n at 10–14.

The Court thus finds that Defendants' selection and use, either directly or through their

agent, of U.S. correspondent accounts, due diligence, and communications with FGG concerning

investments with BLMIS in New York support the Court's exercise of jurisdiction over the claims

for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV

was wrong.  The contacts are not random, isolated, or fortuitous.  The contacts demonstrate the

Defendants' purposeful activities aimed at New York in order to effectuate transfers from Sentry.

The Plaintiffs have thus provided allegations and supporting documentation that sufficiently

support a prima facie showing of jurisdiction over the Defendants.

**C.**  **Whether the Claim Arises Out of or Relates to the Defendants' Forum Conduct**

The suit must "arise out of *or relate to* the defendant's contacts with the forum."  *Ford*

*Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362, 141 S. Ct. 1017, 1026, 209 L. Ed.

2d 225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the

defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, a court need only find "an

affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendants argue that "any activity in connection with investments in Sentry is wholly unrelated to the Liquidators' constructive trust claim[.]" Reply at 12, ECF No. 113. However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated. *See* Am. Compl. ¶¶ 119 –127, No. 70. The issue of knowledge of the inflated NAV is inextricably tied to the Defendants' investments with New York-based BLMIS. The allegations are directly related to Defendants' investment activities with BLMIS through the Fairfield Funds. *Id.* ¶ 121. The Defendants' contacts with the United States, in investing in, in communications with, and redemptions from the Fairfield Funds, form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendants' activities in the forum. *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29, 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

**D.  <u>Whether Assertion of Personal Jurisdiction is Reasonable</u>**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold showing of the minimum contacts required for [exercising personal jurisdiction], a defendant must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3 (quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the burden on the defendant, the interests of the forum in adjudicating the case, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the states in furthering fundamental substantive social policies.  *See Bank Brussels Lambert*, 305 F.3d at 129.

The Defendants argue that the *Bank Brussels Lambert* factors "counsel against the exercise of jurisdiction."  Mem. L. at 28, ECF No. 65.  First, the Defendants argue that the Court's exercising of jurisdiction over them here would burden them because they are organized in foreign countries "and have no operations or employees in the United States."  *Id.* at 23.  The Court recognizes that its exercise of jurisdiction over the Defendants may impose a minimal burden by requiring them to travel to the forum.  However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).

The Defendants also argue this factor requires courts to "evaluate the location of the defendant," as to not permit the "conveniences of modern communication and transportation" argument to "justify exercising specific jurisdiction under every circumstance[.]"  The Second

Circuit found in *Bank Brussels Lambert* that a defendant's purposeful availment to New York "certainly belies any claim that the exercise of jurisdiction by New York will impose an undue burden on the [defendant] under the first factor." *Bank Brussels Lambert*, 305 F.3d at 129. Having found that the Defendants, either directly or through their agents, knowingly invested in the U.S. financial market, repeatedly used U.S.-based correspondent accounts, and conducted due diligence in New York, the Court finds it reasonable to exercise jurisdiction over the Defendants under the first *Bank Brussels Lambert* factor.

Second, the Defendants argue that "[t]he United States has no interest in this action brought by foreign plaintiffs against foreign defendants for foreign conduct," because "both the Liquidators and the [] Defendants are foreign." Mem. L. at 28. Further, the Defendants noted that the Subscription Agreements between the parties "are governed by foreign law … and were not executed in the United States." *Id.* (citing *Sherwin-Williams Co. v. C.V.*, 2016 WL 354898 at *5 (S.D.N.Y. Jan. 28, 2016) (finding that the forum "whose laws govern the parties' agreement [] is undoubtedly the most suitable forum for settling contested issues of [that forum's] laws.")). The main proceeding this adversary action stemmed from is an 'ancillary' Chapter 15 case in which the Court is acting 'to aid foreign jurisdictions in administering bankruptcies . . ." *See In re Fairfield Sentry Ltd.*, 458 B.R. 665, 686 (S.D.N.Y. 2011) (Preska, C.J.)). But the ancillary character of Chapter 15 cases does not necessarily mean that the United States has minimal interest in the dispute. Indeed, courts have recognized that the United States has a strong interest in ensuring the integrity of its financial systems, and the Court has repeatedly emphasized such interest in other adversary actions related to the BLMIS Ponzi scheme. *See Licci IV*, 732 F.3d at 174 ("[T]he United States[] and New York [have an] interest in monitoring banks and banking activity to ensure that its system is not used as an instrument in support of terrorism, money

39

laundering, or other nefarious ends."); *see also, In re Fairfield Sentry Ltd.*, 658 B.R. 257, 277 (Bankr. S.D.N.Y. 2024); *In re Fairfield Sentry Ltd.*, 657 B.R. 1, 23 (Bankr. S.D.N.Y. 2024). The fact that the parties' Subscription Agreements are foreign contracts governed by foreign laws does not overcome the forum's interest in exercising jurisdiction over the Defendants. As the Liquidators noted, the core of their case here arises from the Defendants' alleged investments into the United States' financial market via BLMIS. Such investments played a key role in facilitating Madoff's Ponzi scheme, and considering the United States' interest in monitoring its banking system, the Court disagrees with the Defendants that this case raises "contested issues" most suitable for settlement in a foreign forum. *See* Curaçao Entities Opp'n at 38, ECF No. 97; *see also* Group Opp'n at 38, ECF No. 100.

Third, Defendants argue that "the Liquidators have no greater interest in obtaining convenient and effective relief in this forum than in alternative fora" because "under the brokerage and custody agreements with the Citco Defendants, the [Fairfield] Funds agreed that the mandatory and exclusive forum for litigating disputes against the Citco parties … was the Netherlands." Mem. L. at 23–24. However, the Court is unconvinced that the forum selection clause from the Defendants and the Fairfield Funds' brokerage and custody agreements is relevant here. Indeed, while examining this factor in *Bank Brussels Lambert*, the Second Circuit explicitly noted that "[t]he third [factor] implicates the ease of access to evidence and the convenience of witnesses[.]" *Bank Brussels Lambert*, 305 F.3d at 130. But even if the Court finds such forum selection clause relevant here, the Defendants' argument still falls short. Specifically, the Defendants fail to establish that the Plaintiffs have no greater interest in obtaining relief in the United States than in the Netherlands, when the forum selection clause only shows that the Plaintiffs have a concurrent interest in obtaining relief in the Netherlands.

40

Fourth, the Defendants briefly argue that "the judicial system's interest in obtaining an efficient resolution … strongly favors declining jurisdiction because the relevant evidence and witnesses are located in [a] foreign jurisdiction."  Mem. L. at 24 (citing *Sherwin-Williams Co.*, 2016 WL 354898 at *6.).   Yet, as the Court already discussed, the conveniences of modern communication and transportation ease this potential burden.  *See Queen Bee of Beverly Hills, LLC*, 616 F.3d at 173.  Although the relevant evidence and witnesses may be located outside of the United States, the Defendants have not identified any specific challenges with "obtaining an efficient resolution" here.  Indeed, as the Plaintiffs noted in their opposition, Courts in this District have recognized that "[a] Court's retention of jurisdiction over [an] action would undoubtedly provide the fastest and most practical means of resolving [the] dispute [because] [t]he Court is already intimately familiar with the parties, facts, and legal issues."  Group Opp'n at 40. (quoting *Gucci Am., Inc. v. Weixing Li*, 135 F.Supp.3d 87, 100 (S.D.N.Y. 2015)).  Considering the Court's familiarity with this case and the lack of evidence that the parties' litigation of the dispute here would hinder an "efficient resolution," the Court finds that the fourth *Bank Brussels Lambert* factor does not favor declining jurisdiction over this adversary action.

Lastly, Defendants have also alleged that other forums may be able to hear the claims. What Defendants have not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendants do not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22 CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendants have not established that the Court's exercise of personal jurisdiction over them would be unreasonable.  The Court thus finds that exercising jurisdiction over the Defendants is reasonable

41

and comports with "traditional notions of fair play and substantial justice . . . ." *See Int'l Shoe*, 326

U.S. at 316, 66 S. Ct. 154.

## V.   <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendants' Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1.

**IT IS SO ORDERED.**


Dated: December 20, 2024
      New York, New York

                  /s/ John P. Mastando III _____
                  THE HONORABLE JOHN P. MASTANDO III
                  UNITED STATES BANKRUPTCY JUDGE